Y.O., By and Through his parent
and next friend, Ms. M.

v.

**NEW BRITAIN BOARD
OF EDUCATION**

No. CIV. 3:96CV1922 (HBF).

United States District Court,
D. Connecticut.

Feb. 11, 1998.

Gregory B. Ladewski, Berchem, Moses & Devlin, P.C., Milford, CT, for Defendant.

Richard T. Roznoy, David C. Shaw, Hartford, CT, for Plaintiff.

### RULING ON PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

FITZSIMMONS, United States Magistrate Judge.

Y.O. brings this action against the New Britain Board of Education for attorneys' fees and costs incurred in the administrative proceedings initiated by the plaintiffs to challenge the special education services offered to him by the Board. The basis for this reimbursement claim is the Individuals with Disabilities Education Act ("IDEA") which permits "prevailing parties" to obtain attorney's fees. 20 U.S.C. § 1415(e)(4)(B).

Pending is plaintiff's Motion for Summary Judgment [Doc. # 16], Motion for Attorneys' Fees and Costs for Time Subsequent to May 27, 1997 [Doc. # 22] and Motion for Attorneys' Fees and Costs Subsequent to July 14, 1997 [Doc. # 26]. For the reasons that follow, plaintiff's motions are GRANTED in accordance with this ruling.[1]

### STANDARD

In a motion for summary judgment, the burden is on the moving party to establish that there are no genuine issues of material fact in dispute and that it is entitled to judgment as a matter of law. Rule 56(c), Fed.R.Civ.P.; *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A court must grant summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact." *Miner v. Glens Falls*, 999 F.2d 655, 661 (2d Cir.1993) (citation omitted). A dispute regarding a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Aldrich v. Randolph Central School District*, 963 F.2d 520, 523 (2d Cir.) (quoting *Anderson*, 477 U.S. at 248), *cert. denied*, 506 U.S. 965, 113 S.Ct. 440, 121 L.Ed.2d 359 (1992). After discovery, if the non-moving party "has failed to make a sufficient showing on an essential element of [its] case with respect to which [it] has the burden of proof," then summary judgment is appropriate. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The court resolves "all ambiguities and drawls all inferences in favor of the nonmoving party in order to determine how a reasonable jury would decide." *Aldrich*, 963 F.2d at 523. Thus, "[o]nly when reasonable minds could not differ as to the import of the evidence is summary judgment proper." *Bryant v. Maffucci*, 923 F.2d 979, 982 (2d Cir.), *cert. denied*, 502 U.S. 849, 112 S.Ct. 152, 116 L.Ed.2d 117 (1991). *See also Suburban Propane v. Proctor Gas, Inc.*, 953 F.2d 780, 788 (2d Cir.1992).

In the context of a motion for summary judgment pursuant to Rule 56(c), disputed

---

1. The parties consented to exercise of jurisdiction by a magistrate judge on April 30, 1997. [Doc. # 13].

issues of fact are not material if the moving party would be entitled to judgment as a matter of law even if the disputed issues were resolved in favor of the nonmoving party. Such factual disputes, however genuine, are not material, and their presence will not preclude summary judgment. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *see also Cartier v. Lussier,* 955 F.2d 841, 845 (2d Cir.1992).

*FINDINGS OF FACT*

With this standard in mind, the court finds the following facts to be undisputed.

1. At the time of this action, Y.O. was a seventeen (17) year old student at New Britain High School in New Britain Connecticut. [Doc. # 18 ¶ 1].

2. New Britain Board of Education is the local educational agency charged with providing plaintiff with an appropriate education pursuant to the Individuals with Disabilities Act (IDEA), 20 U.S.C. § 1400 *et seq. Id.* ¶ 2.

3. On October 25, 1995, Mrs. M. requested a PPT to evaluate Y.O. for Attention Deficit Disorder. Her request states in relevant part,

> [Y] has a hystory [sic] of under achievement, Many of his part teachers have had this concern.

> [Y] is concerned that his memory does not work well.

> He currently has writing problems and has had speech problems throughout elementary school. [Y] gets easily distracted which affects his ability to concentrat[e]. This year [Y] is committed to succeeding in school, however, he lacks confidence in accomplishing his goal.

> I believe that if [Y] is diagnosed with ADD, we then can appropriately address this condition. Thus, [Y] will then have a better understanding of himself and he would be able to receive the support he needs in order to become ... a productive citizen.

> I hope he can have a PPT as soon as possible so that all parties involved in this process can start working together to help [Y] achieve his educational goals.

Pl.Ex. A.

4. Mrs. M. "believed he had attention deficit disorder (ADD) and/or attention deficit hyperactivity disorder (ADHD). Y. had continual problems at school and difficulties in applying himself and in learning the materials and attending school." M. Aff. ¶ 5.

5. On November 15, 1995, Mrs. M. signed authorizations for psychological and educational testing of Y.O. by the Board. Neiff Aff. ¶ 9.

6. In December 1995, a psychological evaluation of Y.O. was completed by the Board. The psychological evaluation found that Y.O. has an I.Q. in the average range, and should be able to produce average work in school. The psychological evaluation further concluded, on the basis of "state of the art assessment tools," that Y.O. "does not demonstrate clinical significance for ADHD or depression." The psychologist evaluator noted that the validity of psychological and academic testing was in question as long as Y.O. continued to use illegal drugs, and concluded that Y.O.'s drug use "may be interfering with his educational progress." Neipp Aff. ¶ 10.

7. The psychological report stated in part,

> While Y.'s mother states that he demonstrates some characteristics of attention problems and depression, these conditions are not manifested to a sufficient degree to be classified as clinically significant on the standardized behavior rating scales at this time.

> [Y] should be able to produce average work in school.

Faith S. Churchill, School Psychologist, Heather M. DiMartino, School Psychology Intern, Confidential Study, New Britain Consolidated School, 12/12, 12/18/95.

8. In December 1995, the Board also conducted an educational evaluation of Y.O. The educational evaluator concluded that Y.O.'s skills were generally within the average range and that he "demonstrated extensive strengths" in all academic areas tested except general knowledge, in which he scored at the thirty-second (32%) percentile. The evaluator concluded that the results may un-

derestimate Y.O.'s capabilities. Neipp Aff. ¶ 11.

9. Mrs. M. "requested that the New Britain Board of Education provide Y. with an independent neuropsychological evaluation conducted by a neuropsychologist capable of taking into account bilingual and bicultural issues, because [she] believed the Board's previous evaluators were biased and therefore their results were flawed." M. Aff. ¶ 6.

10. On May 3, 1996, Ms. M. requested a hearing to challenge the Board's refusal to provide an independent neuropsychological evaluation of Y.O. The letter states in relevant part

In March 18, 1996, there was the PPT to discuss the test result. That PPT was a frustrating experience for me and I was given a recommendation that I disagreed with: that [Y] be tested again in six months for neurological and personality difficulty. However, at that time I did not know the school's procedure for disagreements in PPTs and I accepted the only alternative that was offered to me.

Later, on I consulted with mental health professionals and I also personally met with Dr. Gerald Neipp. As a result, the PPT decision was changed to have [Y] tested now. Dr. Pat Brown then informed me that the school system will do it. However, I would like an external independent test. That is why I am now requesting that the State Department of Education grant me a do [sic] Process meeting.

[Pl.Ex. B].

11. At the time the hearing was requested, the Board refused to provide Y.O. with an independent neuropsychological evaluation and contended that its evaluations were appropriate. M. Aff. ¶ 7

12. At the PPT on May 6, 1996, Mrs. M requested a bicultural, bilingual neuropsychological evaluation. Mrs. M. requested that Dr. Julia Ramos McKay Grenier conduct the evaluation. Neiff Aff. ¶¶ 115–16.

13. Members of the PPT and the Board rejected plaintiff's request. The Board also objected to the demand that it pay for an evaluation by Dr. Julia Ramos McKay Grenier, whom the Board did not feel was appropriate to perform the evaluation. Neiff Aff. ¶¶ 17–18.

14. The PPT offered to provide a neuropsychological evaluation by Mike Regan, who is bilingual, and offered to provide services in the Special Education Inclusion ("SEI") program at New Britain High School. Neiff Aff. ¶¶ 20, 22.

15. A due process hearing was scheduled for June 13, 1996 but was postponed. Neiff. Aff. ¶ 23, M. Aff. ¶ 9.

16. A prehearing conference was held on June 25, 1996. M. Aff. ¶ 10. At the conference the parties discussed the issues and worked toward a resolution. A July 8, 1996 hearing, was also postponed while settlement discussion continued. M. Aff. ¶ 10.

17. On July 24, 1996, the parties stipulated and agreed to a resolution of the issues raised by Mrs. M. in her request for an administrative hearing. The stipulation states:

1. Diana Badillo Martinez shall perform an independent neuropsychological evaluation of [Y.O.].

2. Within ten (10) business days after receipt of the written independent neuropsychological evaluation, the Board shall convene a Planning and Placement Team (PPT) meeting to discuss the findings of the independent neuropsychological evaluation in relation to [Y.O.]'s educational program.

3. The hearing officer shall retain jurisdiction over this case until such time as the PPT meeting is held, or until this matter is withdrawn and/or settled by the parties.

4. This agreement shall be submitted for approval and adoption by the hearing officer.

5. This agreement is made with no prejudice to the legal rights or positions of either party.

[Pl.Ex. C].

18. On August 14, 1996, the hearing officer issued a Final Decision and Order No. 96–

104 adopting the stipulation of the parties. Pl Ex. D.

19. On July 22, 1996, an independent Neuropsychological Evaluation was conducted by Dr. Diana Badillo Martinez. Dr. Martinez' Evaluation Report states in the Summary that

[Y] is a 17 year old whose intellectual abilities are within the average to low average range, with relative weaknesses in language processing and expression. Given the years he has been exposed to English speaking classes and has lived in the mainland US, it is unlikely that this is a factor due to his "bilingualism." [Y], appears to have some comprehension of Spanish, but is more fluent in English. Within this context, he reveals severe to moderate weaknesses of: *verbal immediate and delayed recall. Marked difficulties consolidating new memories *language tracking *slowed mentation and motor performance.

Mild, but significant deficits of: *verbal abstraction and comprehension * language expression *visual-motor integration.

[Y] will not do well on timed tests and may benefit from additional time on tests to endure quality of responding, rather than quantity. He is also impulsive, dismissive and has a very low frustration tolerance, a tendency that will increase the error rate and likely contribute to his not completing his work. He should be encouraged to be more aware of this and to moderate the response style to a more reflective stance.

[Y] is also very significantly depressed, angry acts out rebelliously. The lack of success and possibility hopelessness in this regard will exacerbate these feelings. In circular fashion, the strong, self-defeating behaviors, characterized by marijuana use, explosiveness, low-motivation, and absenteeism interfere with social interactions and academic achievement. He manifests antisocial behaviors, and given the depressive state, is at very high risk to continue engaging in antisocial activity and substance dependence. Affect is constricted, he has significant and longstanding sleeping difficulty, nailbiting, and irritability. [Y]'s insight into his feelings and behaviors

is low. The intensity of the affective distress and marijuana use contributes to compromise cognitive efficiency and ultimately his performance. The emotional component is a prominent factor contributing to disrupt his capacity to sustain attention and concentration and should be actively addressed. Academic achievement is significantly below his intellectual abilities and is affected by deficits of cognitive processing, and intense depression. The affective status warrants intervention to ensure academic success.

Diagnosis: Cognitive Disorder, Dysthymic Disorder, Mixed Receptive–Expressive Language Disorder, Disorder of Written Expression, Conduct Disorder, adolescent onset, Cannabis Dependence, early partial remission.

Pl.Ex. 1.

20. Dr. Martinez further recommended:

— individual psychotherapy to provide support and assist to ameliorate depression and anxiety and assist to resolve deep anger, rebelliousness and issues regarding feelings of abandonment and low self-esteem. Medication to alleviate depression is suggested.

— Family therapy to address parental issues which affect Y's behavior and assist the family to process behavior management issues and agree on clear rules of behavior.

— Extracurricular activities such as Big Brother program or Sports teams.

— Speech therapy to improve vocabulary and expressive skills.

— Cognitive retraining and educational Assistance to assist Y to develop efficient new learning and memory skills. Tutoring to address academic gaps. Due to the low frustration tolerance and personality traits, he will initially require a highly individualized, well structured approach to ensure adherence and success. Consider providing extra time to complete tests, given the slowness of performance. Enhance visual cues and use of the visual modality to facilitate new learning and recall, given the severe verbal memory problem:

— Monitor the cognitive and emotional functioning. Re-evaluate status of dysthy-

mia, anxiety, academic standing and adherence to goals within a year.

— Mandatory participation in a substance education program for adolescents (e.g. ALA TEEN). Periodic urine testing.

21. Following receipt of Dr. Martinez' report a PPT was held on August 14, 1996, which determined that Y.O. was entitled to special education services. Two subsequent PPT's were held at which an Individual Education Plan (IEP) was designed and implemented to serve Y.O.'s needs. [Pl.Ex. E–1, E–2, E–3].

## DISCUSSION

### A. "Prevailing Party"

Plaintiff argues that he is a "prevailing party" under the IDEA and therefore entitled to attorneys' fees and costs. The IDEA provides that

> in any action or proceeding under this subsection, the court, in its discretion, may award reasonable attorney's fees as part of the costs to the parents or guardians of a child or youth with a disability who is the prevailing party.

20 U.S.C. § 1415(e)(4)(B). Thus, the threshold issue is whether plaintiff is a prevailing party for purposes of this reimbursement action.

The Board first contends that plaintiff was "unsuccessful in receiving the specific type of evaluation demanded, and equally unsuccessful in obtaining an evaluation by the specific individual demanded." [Doc. # 21 at 12]. Second, defendant argues that "Y.O. did not receive a significantly different educational program or services as a result of the initiation of due process." *Id.* at 13. Last, the Board argues that plaintiff is "entitled to attorneys' fees only to a degree commensurate with and proportionate to the extent of their success in the due process hearing." *Id.* at 16.

■ The legal standard for determining "prevailing party" status in an attorney fee action under the IDEA is the same as that governing the award of attorney fees in civil rights litigation pursuant to 42 U.S.C. § 1988. *See Angela L. v. Pasadena Indep. School District,* 918 F.2d 1188, 1193 (5th Cir.1990) (citing the legislative history of IDEA); *Barbara R. v. Tirozzi,* 665 F.Supp. 141, 145 (D.Conn.1987). Under this standard, a party may be deemed "prevailing" if the party succeeds on "any significant issue in litigation which achieves some of the benefit the parties sought in bringing suit." *Hensley v. Eckerhart,* 461 U.S. 424, 434, 103 S.Ct. 1933, 76 L.Ed.2d 40 (1983); *accord Heldman v. Sobol,* 846 F.Supp. 285, 288 (S.D.N.Y.1994). The Supreme Court has explained that, in making this determination, a court must consider whether the plaintiff (1) obtained relief on a significant claim in litigation, (2) that effected a material alteration in the parties' legal relationship and (3) that is not merely technical or *de minimis* in nature. *Texas Teacher's Assoc. v. Garland Indep. School District,* 489 U.S. 782, 791–93, 109 S.Ct. 1486, 103 L.Ed.2d 866 (1989).

■ Based on the criteria set forth in *Texas Teachers,* as well as the undisputed facts, plaintiff *is* a prevailing party within the meaning of the IDEA. First, the plaintiff obtained relief on a significant claim in litigation. As a result of the hearing request and negotiated settlement, the Board retained an independent psychologist to evaluate Y.O. Additionally, Dr. Martinez *did* evaluate Y.O.'s language function and the effect of "bilingualism" on his ability to perform in school. After receipt of Dr. Martinez' evaluation, the Board also agreed to provide special education services to Y.O. in December 1996 that were not previously offered. Importantly, after the Board conducted a psychological and educational evaluation on Y.O., it did not recommend any special education services.

The Court is not persuaded that because Mrs. M. requested testing for ADD or ADHD which were not diagnosed or that because the parties agreed to Dr. Martinez, somehow the plaintiff was not prevailing party. Indeed, parents should not be discouraged from requesting testing of their child or independent evaluations where, as here, the child is struggling in school and evaluations performed by the Board can identify no problems. It is paramount under the IDEA that a child has a "right to a free appropriate

education" and that the parents have a "right to participate fully in developing a proper IEP." *Burlington School Comm. v. Mass. Dept. of Educ.*, 471 U.S. 359, 370, 105 S.Ct. 1996, 85 L.Ed.2d 385 (1985).

Second, plaintiff achieved a material alteration in the legal relationship between himself and the Board: he obtained an enforceable order that enabled him to receive particular educational services that had previously been unavailable to him. The undisputed facts reveal that the plaintiff achieved considerably more relief through the hearing process than at the March 18 and May 6 PPT meetings. The fact that the parties resolved their dispute through settlement, rather than through full adjudication, does not preclude a plaintiff from claiming attorney's fees as a "prevailing party." *Maher v. Gagne*, 448 U.S. 122, 129, 100 S.Ct. 2570, 65 L.Ed.2d 653 (1980); *Barlow–Gresham Union High School District No. 2 v. Mitchell*, 940 F.2d 1280, 1284 (9th Cir.1991) (applying *Maher* in an IDEA action); *Barbara R.*, 665 F.Supp. at 145 (same).

Under the final test set forth in *Texas Teachers*, plaintiff's relief was neither "technical" nor "*de minimis.*" While the "degree" of difference in plaintiff's educational program achieved as a result of the settlement between the parties may be disputed, it is clear that the "kind" of services now provided as a result of the settlement are significantly different than those previously specified and therefore not *de minimis.* Thus, the court finds that the plaintiff, as prevailing party, is entitled to attorney's fees.

B. *Reasonable Attorney's Fees and Costs*

■ Once a plaintiff meets the prevailing party threshold, "[i]t remains for the district court to determine what fee is 'reasonable.'" *Hensley v. Eckerhart*, 461 U.S. 424, 433, 103 S.Ct. 1933, 76 L.Ed.2d 40 (1983). The plaintiff asserts that he is entitled to attorney's fees $7,482.90 [2] and costs of $165.40 totaling $7,482.90.

■ Generally, to determine a reasonable fee, courts apply the "lodestar" method under which the court must (1) estimate the number of hours worked (excluding those which are excessive, redundant, or otherwise unnecessary); (2) determine the prevailing hourly rate for attorneys of similar experience in the same region and (3) multiply the prevailing hourly rate by the number of hours worked. *Blum v. Stenson*, 465 U.S. 886, 897, 104 S.Ct. 1541, 79 L.Ed.2d 891 (1984); *Karan v. Adams*, Civ. No. H–90–135 (JAC), slip op. at 2 (D.Conn. May 27, 1993).

■ After review of the affidavits submitted on behalf of the fee petition, the court finds the time records to be sufficiently specific and the hours expended and the costs incurred to be reasonable in light of the nature of this action. *Cf. Rank v. Balshy*, 590 F.Supp. 787, 790 (M.D.Pa.1984).

The Board's argument that attorneys' fees should be reduced because plaintiff's success was limited is without merit. As stated in this opinion, plaintiff received an independent evaluation, an order for the relief requested, and special services previously not offered.

The court further finds that an hourly rate of $250 per hour is a reasonable rate for Mr. Shaw in light of his skill, experience and the prevailing rates for professional services rendered in the community. *Cf. Blum*, 465 U.S. at 895 (fee awards "are to be calculated according to the prevailing market rates in the relevant community."); *Burr v. Sobol*, 748 F.Supp. 97, 101–03 (S.D.N.Y.1990) (assessment of the appropriate hourly rate may include consideration of the attorney's experience, educational background, type of practice, and nature of the case) (citing *New York State Ass'n for Retarded Children, Inc. v. Carey*, 711 F.2d 1136, 1147 (2d Cir.1983)). *Compare C.G. v. New Haven Bd. of Educ.*, No. 3:96CV1402 (RNC) (D.Conn. Sept. 29, 1997) ($250 per hour rate for Mr. Shaw); *Ruben R. v. Hartford Bd. of Educ.*, No. 3:93CV1695 (AWT) (D. Conn. August 28, 1996 ($230 per hour rate for Mr. Shaw); *G.R. v. Regional Such. D. No.15, No.*, 3:95CV2173

---

2. This amount reflects work performed by: (1) Attorney Shaw .6 (hour expended) × $250 (reasonable hourly rate) = $150.00; (2) Attorney Fausey 32.5 (hours expended) × $125.00 (reasonable hourly rate) = $4,062.50; (3) Attorney Roznoy 20.7 (hours expended) × $150 (reasonable hourly rate) = 3,105.00. Totaling $7,317.50 (attorneys' fees) plus $165.40 (costs) =$7,482.90.

(AHN) (D.Conn. December 26, 1996) ($225 per hour rate set for Mr. Shaw); *Jay S. v. Griswold Board of Education,* Civ. No. 3:93CV464 (AHN), slip op. at 8 (D.Conn. Aug. 1, 1994) (finding $200 to be the reasonable hourly rate for Mr. Shaw); *Karan v. Adam,* No. H:90CV135 (JAC) (D.Conn. May 27, 1993) slip op. 7–8 (finding $230 to be reasonable hourly rate for Mr. Shaw). The court similarly finds that the hourly rate of $125 per hour is a reasonable rate for Attorney Fausey and the hourly rate of $150 is a reasonable rate for Attorney Roznoy. The court notes that the Board does not object to the reasonableness of the hourly rate for Attorneys Shaw, Fausey or Roznoy or the number of hours spent litigating this case. Based on these findings, the plaintiff is entitled to an award of $7,317.50 in attorney's fees, plus $165.40 for related costs.

### C. *Motions for Attorneys Fees for Time Spent after May 27, 1997 and July 14, 1997*

■ Plaintiff moves for an additional attorneys' fee award of $2,685[3] for time spent from May 27 through July 14 and an additional award of $2,670[4] for time spent from July 14 through August 14, 1997. Attorney Roznoy's time records reflect time spent researching and drafting further responses to the summary judgment motions and preparation of these motions for attorneys' fees. A plaintiff's recovery of attorneys' fees for work done in connection with the fee application is appropriate. *Gagne v. Maher,* 594 F.2d 336, 343 (2d Cir.1979), *aff'd,* 448 U.S. 122, 100 S.Ct. 2570, 65 L.Ed.2d 653 (1980). The Board does not contest the reasonableness of the fee or number of hours that Attorney Roznoy spent during this time period. Defendant simply reasserts the argument already presented in its opposition memorandum.

Based on the court's analysis of plaintiff's claims for attorneys' fees incurred in connection with his motion for summary judgment, the Court also finds that supplemental fees in the amount of $5,355 are appropriate.

**3.** This amount reflects 17.9 (hours expended by Attorney Roznoy) × $150 (hourly rate) = $2,685.

*CONCLUSION*

For the reasons stated, plaintiff's Motion for Summary Judgment [Doc. # 16], Motion for Costs and Fees Spent on Case Subsequent to May 27, 1997 [Doc. # 22], and Motion for Costs and Fees for Time Spent on Case Subsequent to July 14, 1997 [Doc. # 26] are GRANTED in accordance with this ruling.

The court determines that the plaintiffs are entitled to attorney's fees in the amount of $12,672.50, and related costs in the amount of $165.70. The Clerk shall enter judgment accordingly.

This is not a recommended ruling. The parties consented to proceed before a United States Magistrate Judge [Doc. # 13] on April 30, 1997, with appeal to the Court of Appeals.

**4.** This amount reflects 17.8 (hours expended by Attorney Roznoy) × $150 (hourly rate) = $2,670.