M.C., By and Through his parent and next friend, MRS. C., Plaintiff,

v.

**VOLUNTOWN BOARD OF EDUCATION, Defendant.**

**No. 3:97–CV–2208 (GLG).**

United States District Court, D. Connecticut.

July 26, 1999.

David C. Shaw, Andrew A. Feinstein, Richard T. Roznoy, Law Offices of David C. Shaw, Hartford, CT, for plaintiff.

Frederick L. Dorsey, John M. Simon, Siegel, O'Connor, Schiff & Zangari, P.C., New Haven, CT, for defendant.

## OPINION

GOETTEL, District Judge.

Plaintiff M.C., by and through his parent and next friend, Mrs. C.,[1] brought this action under the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. §§ 1400–1487,[2] to partially challenge a decision of a due process hearing officer. The parties' dispute centers on the individualized education programs ("IEPs") developed for M.C. for the 1996–97 and 1997–98 school years, when he was in eighth and ninth grades, respectively. While the parties agreed that M.C. required a placement outside the Voluntown school system, they disagreed on an appropriate placement. The parties have now cross-moved for summary judgment. For the following reasons, their motions are GRANTED IN PART and DENIED IN PART.

### FACTUAL BACKGROUND

M.C. is currently sixteen years old and has been receiving special education services from defendant Voluntown Board of Education ("Voluntown" or "Board") since fourth grade. For the 1995–96 school year, when he was in seventh grade, M.C.'s Planning and Placement Team ("PPT") identified him as having Attention Deficit Hyperactivity Disorder ("ADHD") with a secondary identification of Central Auditory Processing disorder. According to Mrs. C., he also has a learning disability in written expression and he has difficulty processing information, particularly verbal information. Tr. of 4/10/97, at 49.

In the spring of 1995, when M.C. was in sixth grade, the parents hired an advocate, Cathy Ziegler, for the purpose of improving his life at school. Tr. of 4/10/97, at 81. At the advocate's suggestion, the Board arranged and paid for him to receive several evaluations to assist with the development of his IEP. *See* Exs. B–2.0 to B–2.4. On September 14, 1995, a PPT meeting was held to prepare M.C.'s seventh-grade IEP for the 1995–96 school year. Ex. B–5. The PPT reviewed the evaluators' reports and concluded that M.C. needs time to process information, needs assistance with organization on every level, has a significant problem with writing and the written language, and needs help becoming a self-advocate. *Id.* at 2–4. The team concluded that his IEP should consist of education in a regular classroom with modifications to address his disability and corresponding needs. *Id.* at 5. Despite the modifications, M.C. had difficulty in school that fall and experienced severe depression. When he continued deteriorating academically, his mother decided to remove him from Voluntown in mid-January 1996.

An emergency PPT meeting was held on February 8, 1996 to change M.C.'s program. Among others, the PPT members included M.C.'s parents, Cathy Ziegler, and T. Anita Powers, Voluntown's Special Education Coordinator. The PPT agreed that M.C. required an outside placement and discussed several options. Until one could be found, the PPT decided to place M.C. on home-bound instruction with ten hours of tutoring per week. At Ziegler's suggestion, the PPT agreed to ask Dr. Susan Sharp, an independent special education consultant who had evaluated M.C., to draft an IEP. The PPT meeting ended after the team agreed to meet again in one month to review the draft IEP. This meeting never took place, and M.C. continued with home-bound instruction for the remainder of the school year.

Even though his depression improved during the period of home-bound instruc-

---

1. M.C.'s parents are divorced and he is living with Mrs. C. However, both parents have been involved in his education.

2. In this case, we apply the pre–1997 amendments to the IDEA because the dispute arose in 1996 when M.C.'s parents challenged his placement for the 1996–97 school year. *See Cedar Rapids Community Sch. Dist. v. Garret F.,* —— U.S. ——, 119 S.Ct. 992, 995 n. 1, 143 L.Ed.2d 154 (1999) (using the version of the IDEA in effect when the dispute arose).

tion, M.C. worsened academically. Tr. of 4/10/97, at 98, 100–01. On June 5, 1996, Powers wrote to Mrs. C. to give her an update on M.C.'s progress. With little more than two weeks left before the end of the school year, M.C. was missing multiple assignments in Math, English, Literature, and Science. Ex. B–37. Powers explained the requirements M.C. would have to meet in order to advance to eighth grade. Yet by June 17th, M.C. was failing seventh grade because of the lack of work completed by that time. Ex. B–13, at 1.

Also on June 17th, a PPT meeting was held to develop M.C.'s IEP for the next school year. *See* Ex. B–13. Approximately eleven people attended including M.C.'s parents, Ziegler, Powers, and Dr. Sheldon Gardner, M.C.'s psychologist. The team first reviewed the proposed IEP drafted by Dr. Sharp and made several modifications to it, such as dropping a computer skills class and instead providing M.C. with appropriate software to assist him with his written work. *Id.* at 2. They then discussed M.C.'s current performance, including his multiple, missing assignments. To ensure that M.C. advanced to the eighth grade, the PPT decided to give M.C. an "incomplete" in certain subjects with the expectation that he could make up the work in these subjects through summer tutoring. Ziegler suggested that instead of tutoring, M.C. could attend a five-week summer program at The Rectory School, which is a private school in Pomfret, Connecticut. *Id.* at 2–3. Nevertheless, the team approved summer tutoring for thirty hours or as long as necessary so that M.C. would pass seventh grade. *Id.* at 3. With respect to M.C.'s placement for the 1996–97 year, the team agreed that M.C. needed a placement outside of the Voluntown school system, but did not agree on the school.

Despite the PPT's recommendation, M.C.'s parents placed M.C. at The Rectory School for its summer program. M.C. successfully completed this program and was able to advance to eighth grade. After a state mediation in the fall of 1996, the Board agreed to pay that tuition. Tr. of 5/27/97, at 47–48. Yet, the parties still disagreed on M.C.'s placement for the 1996–97 school year. On August 26, 1996, M.C.'s parents requested an impartial due process hearing to review M.C.'s educational placement set forth in his IEP. Meanwhile, the parents enrolled M.C. as a residential student at The Rectory School, where he remained for eighth and ninth grades.[3]

While these proceedings were pending before the Hearing Officer, a PPT meeting was held on May 27, 1997 to prepare M.C.'s IEP for the 1997–98 school year. The parties discussed most of the issues that had been presented to the Hearing officer, including whether the PPT would recommend sending M.C. to The Rectory School, providing M.C. with a residential placement, and requiring the Board to pay for the services of Ziegler and Dr. Gardner. The PPT rejected all of these requests. Instead, the PPT recommended that M.C. attend either The Learning Clinic or the Alternative Curriculum for Educational Success ("ACES") program at the Norwich Free Academy.

*FINDINGS OF THE HEARING OFFICER FROM THE ADMINISTRATIVE DUE PROCESS HEARING*

The Hearing Officer, Marie S. Bierman, held a pre-hearing conference in September 1996 and heard testimony over six days in 1997 beginning on April 10, 1997. During the course of the administrative hearing, she heard testimony from eleven

**3.** After the 1997–98 school year, M.C. could no longer attend The Rectory School because it stops at ninth grade. Additionally, M.C. could not return to the Voluntown public school system because it runs only from kindergarten through eighth grade. Consequent-

ly, beginning with the 1998–99 school year, M.C. attended the regular education program at the Norwich Free Academy, which is where students from Voluntown usually attend high school, for his sophomore year. Pl.'s Opp'n Mem. of 12/14/98, at 10 n. 8.

witnesses, including: (1) Mrs. C.; (2) M.C.; (3) Cathy Ziegler, the parents' advocate; (4) G. Stanton Geary, the business manager at The Rectory School; (5) Francesca Morano, the Director of Studies at The Rectory School; (6) Carole–Jean Gooder, the Director of Individualized Instruction at The Rectory School; (7) Dr. Sheldon Gardner, a clinical child psychologist; (8) Dr. Susan Sharp, an independent special education consultant; (9) Raymond Ducharme, the Executive Director of The Learning Clinic; (10) T. Anita Powers, the former Coordinator of Special Education for Voluntown; and (11) Kim Michael Caron, the Student Services Administrator of the Norwich Free Academy.

In her final decision and order dated September 15, 1997, the Hearing Officer ruled partially in M.C.'s favor and partially in favor of the Board. With respect to the 1996–97 school year, she concluded that The Rectory School was an appropriate placement. She then ordered that the Board reimburse the parents for the costs of the tuition and the tutoring program, but not the residential program. Ex. SB–31 ¶ 1, at 12. She also found that The Rectory School's and the Board's proposed programs complied with the requirements of 20 U.S.C. § 1412(5)(B). *Id.* ¶¶ 5–6, at 12. Furthermore, she concluded that the Board was not responsible for reimbursing the parents for the counseling services of Dr. Gardner or the advocacy services of Cathy Ziegler. *Id.* ¶¶ 7–8, at 12–13.

With respect to the 1997–98 school year, she found that The Rectory School was not an appropriate program. *Id.* ¶ 2, at 12. Instead, she concluded that "[t]he Board offered an appropriate program for the 1997–98 school year," *id.* ¶ 4, at 12, but she did not identify whether this was The Learning Clinic or the ACES program at Norwich Free Academy. In the "Findings of Fact" section, she noted that at the May 27th PPT meeting, the team had recommended placing M.C. at either The Learning Clinic or the ACES program. *Id.* ¶ 17, at 9. Yet, in the "Conclusions" section, she found that there was not enough evidence to determine whether The Learning Clinic was an appropriate program. *Id.* ¶ 12, at 11. She further found that the "Board's recommendation to place [M.C.] at the Norwich Free Academy for the 1997–98 school year is appropriate." *Id.* ¶ 15, at 12.

Plaintiff then brought this action. Specifically, he claims that he is entitled to reimbursement for the tuition and tutoring costs of The Rectory School for the 1997–98 school year, the costs of the residential program for eighth and ninth grade, and the costs of Dr. Gardner's counseling services.[4]

## DISCUSSION

At the administrative level, the school board bears the burden of establishing that the child's placement set forth in the IEP is appropriate. *Walczak v. Florida Union Free Sch. Dist.*, 142 F.3d 119, 122 (2d Cir.1998). On an appeal from a hearing officer's decision, we conduct an independent review of the ruling and give due weight to the administrative proceedings. *Board of Educ. of Hendrick Hudson Cent. Sch. Dist. v. Rowley*, 458 U.S. 176, 205, 102 S.Ct. 3034, 73 L.Ed.2d 690 (1982); *Walczak*, 142 F.3d at 129. We must then base our decision on the preponderance of the evidence. 20 U.S.C. § 1415(e)(2).

As plaintiff does not contend that the Board violated any of the IDEA's procedural requirements, the only issue for us is whether M.C.'s IEPs for the 1996–97 and 1997–98 school years were reasonably calculated to enable him to receive education-

---

4. Plaintiff has dropped his claim for reimbursement of the costs of Cathy Ziegler's services as a family advocate. Pl.'s Mem. of 9/11/98, at 14 n. 4. Additionally, the Board did not appeal from the Hearing Officer's finding that the day program at The Rectory School was an appropriate placement for the 1996–97 school year. Thus, we do not address these issues.

al benefits. *Rowley*, 458 U.S. at 206–07, 102 S.Ct. 3034.

## I. Costs of the Residential Program at the Rectory School

■ Although the Hearing Officer found that The Rectory School was an appropriate placement for the 1996–97 school year, she limited her decision to the day program. She found that the parents had enrolled M.C. as a residential student after the due date for day-student admissions had passed, and only residential slots were available. Ex. SB–31 ¶ 10, at 8. Thus, she concluded that the Board was not responsible for the costs of the residential program because "[t]here is no place in the record where there is any indication that [M.C.] needed a residential placement to make academic progress." *Id.* ¶ 11, at 11.

After reviewing the record, we uphold the Hearing Officer's decision on this issue. To determine if the Board is liable for the costs of the residential program, we must consider whether M.C. requires a residential placement to receive educational benefits. *Rowley*, 458 U.S. at 203, 102 S.Ct. 3034; *Mrs. B. v. Milford Bd. of Educ.*, 103 F.3d 1114, 1122 (2d Cir.1997). The converse must therefore also be true—that without a residential placement, M.C. would not make educational progress.

Plaintiff relies on the testimony of two administrators at The Rectory School as evidence that the residential program was essential for his academic progress. Francesca Morano, the Director of Studies, testified that the residential program:

> provided him with consistency in terms of having the tutor be available to help him outside of class time. I think it provided him a social setting where he had to stretch and learn and follow directions and do what the group needed to do, because social skills are an area where he needs to improve.

Tr. of 6/27/97, at 42. She further testified that it would have been difficult for M.C. to have received an educational benefit if he had not been a resident, because he "needed to have support beyond the confines of the academic day, especially in the evening to make productive use of his time." *Id.* at 56. Similarly, Carole–Jean Gooder, the Director of Individualized Instruction, testified that the residential program was a necessary component of M.C.'s overall educational development because:

> he had contact with the faculty at the school, not just contact in the afternoon, but also in the evening, at all of the meals. He also was—so he developed really good relationships with people on the faculty; also had to interact on the dorm and take some responsibilities there, which he would not be able to experience in a public school setting.

*Id.* at 141–42. In contrast to the testimony of these two witnesses, plaintiff argues that there is no evidence in the record indicating that he did not need a residential placement to make academic progress.

Based on our review of the record, we conclude otherwise. Dr. Susan Sharp, the independent special education consultant who drafted M.C.'s IEP for the 1996–97 school year, testified that she did not know "whether a residential placement is appropriate or necessary for [M.C.]" Tr. of 7/7/97, at 47. She was asked:

Q: Did you ever recommend a residential placement for [M.C.]?

A: No.

Q: If you had thought it was necessary would you have recommended it?

A: Yes.

Q: When you said that The Rectory School was an appropriate placement for [M.C.], were you talking about the residential component of that program?

A: I believe that the residential component is not inappropriate for [M.C.], but whether it is necessary I do not know. I was talking about the school program.

*Id.* at 47–48. We find that Dr. Sharp's testimony is evidence that M.C. could re-

ceive educational benefits without a residential placement.

More convincing, however, is the evidence in the record demonstrating that M.C. made academic progress as a day student during The Rectory School's summer program.[5] Anita Powers, Voluntown's Special Education Coordinator, testified that M.C. was "successful" at The Rectory School's summer program. Tr. of 8/26/97, at 44. Indeed, he did well enough during the five-week program to satisfy the requirements for completing seventh grade. Over the summer, The Rectory School's Admissions Director told Mrs. C. that M.C. "was doing well." Mrs. C. explained that at first he had some trouble fitting in, partly because he was unsure of himself. Initially, he did not want to participate or play in sports. Yet, "he got over that very quickly and it was just amazing how much he accomplished in five weeks." Tr. of 4/10/97, at 167.

According to Mrs. C., he did "amazingly well" in the summer program. When asked why, she testified that for as long as she could remember, M.C. "has always said that he hates school. He went there [to The Rectory School] one day and he said I love this place. I like it here. He was excited. He was happy. He wanted to go back. It was absolutely amazing to me." Id. at 165. She specifically commented on the improvement M.C. made in English. For example, one of his assignments was to write a story about a family trip to Florida. He had written on this same topic at Voluntown elementary school the previous fall, but it was "very,

very short." At The Rectory School, he wrote "[m]aybe two and a half pages. I can't remember exactly. He wrote an awful lot—lots—a lot of detail. What they accomplished with him was absolutely amazing." Id. Based on this evidence, we find that M.C.'s success at The Rectory School's summer program conclusively establishes that he did not require a residential placement to make educational progress.

Moreover, the circumstances surrounding M.C.'s residential placement are unlike the situations presented in other courts within the Second Circuit. In those cases, the parents were granted reimbursement for the cost of residential placements when the child was institutionalized for emotional problems, and the emotional problems prevented the child from making any meaningful educational progress. *Mrs. B.*, 103 F.3d at 1122; *Naugatuck Bd. of Educ. v. Mrs. D.*, 10 F.Supp.2d 170, 180–81 (D.Conn.1998); *Vander Malle v. Ambach*, 667 F.Supp. 1015, 1039–41 (S.D.N.Y.1987). Here, M.C. was not enrolled as a residential student at The Rectory School due to his emotional problems. Rather, Mrs. C. admitted that she opted for the residential program simply because it was too late to enroll M.C. as a day student. *See* Tr. of 4/10/97, at 179–80; Tr. of 5/27/97, at 49 ("Q: Why did you enroll him in the residential program? A: Basically, I didn't have a choice. That was all they ... had open"); Tr. of 8/26/97, at 105.[6] Only at this point did the parents contend that M.C. required a residential program. In-

---

5. M.C. attended The Rectory School's summer program as a day student during the summer of 1996. Mrs. C. testified that he went eight hours per day, five days per week for five weeks. Tr. of 4/10/97, at 164. She explained that the first half of the day was academics and the last half was spent on recreation and sports. M.C. also received about forty-five minutes to one hour per day of one-on-one tutoring. Id. Gooder testified that the academic program consisted of reading, study skills, math, English, a study hall, and one-on-one tutoring. Tr. of 6/27/97, at 160.

6. For example, during Mrs. C.'s direct examination the following exchange took place:

Q: And was [M.C.] also a day student in the fall program?
A: No, he was a boarder.
Q: And why was he a boarder student?
A: Because mostly there was [sic] no day positions. Day slots open. They only—for whatever reason they only take so many day students and they take so many boarding students.

Tr. of 4/10/97, at 179.

deed, Ziegler testified that the "original reason" she and the parents considered the residential program was that they had missed the May 1st deadline for day-student registration. Tr. of 7/3/97, at 101. She further stated that M.C. was put on the waiting list for day student slots. *Id.*

It may be true that the residential placement allowed M.C. to fully develop his academic potential. As plaintiff states, "The residential program at the Rectory School was not just the better of two perfectly acceptable programs. The residential program at the Rectory School was a dramatic success...." Pl.'s Opp'n Mem. of 12/14/98, at 8. Ziegler also testified that The Rectory School had told her that the only way for M.C. to be a "true success" was for him reside there so he could be "immersed completely." Tr. of 7/3/97, at 101–02. That, however, is not the issue. A state is not required to maximize the potential of each disabled child. *Rowley*, 458 U.S. at 189–90, 102 S.Ct. 3034. The Second Circuit has stated that a "disabled child is 'not ... entitled to placement in a residential school merely because the latter would more nearly enable the child to reach his or her full potential.'" *Walczak*, 142 F.3d at 132 (citation omitted) (alteration in original).

In sum, we uphold the Hearing Officer's conclusion that the Board was not responsible for the costs of the residential program at The Rectory School, because we find by a preponderance of the evidence that M.C. did not require a residential

placement to receive educational benefits. Accordingly, we deny plaintiff's summary judgment motion and grant summary judgment in favor of defendant on this issue.

## II. Tuition Costs of the Rectory School for 1997–98

▪ Plaintiff appeals from the Hearing Officer's finding that The Rectory School was not an appropriate placement for the 1997–98 school year, especially in light of her earlier finding that it was appropriate for the 1996–97 school year.[7] In cases where parents are seeking reimbursement for the expenses of unilaterally placing their child in private school, courts typically apply the two-part test set forth in *School Committee of Burlington v. Department of Education of Massachusetts,* 471 U.S. 359, 105 S.Ct. 1996, 85 L.Ed.2d 385 (1985). Under this test, the court considers whether the public school's proposed placement is proper under the IDEA, and if not, whether the parents' proposed placement is appropriate. 471 U.S. at 369–70, 105 S.Ct. 1996; *see Florence County Sch. Dist. Four v. Carter,* 510 U.S. 7, 12, 15, 114 S.Ct. 361, 126 L.Ed.2d 284 (1993).

▪ This case, however, does not fit squarely into the *Burlington* framework. The parties agreed that Voluntown elementary school could no longer educate M.C. because it could not meet his disability-related needs. The parties then began

---

7. Contrary to plaintiff's assertion, the IDEA's stay-put provision does not mandate that the Board is required to pay for the costs of The Rectory School for the 1997–98 school year, solely because these proceedings continued throughout that year. The stay-put provision provides that a disabled child will remain in his then-current educational program during the pendency of the proceedings. 20 U.S.C. § 1415(e)(3). If a hearing officer rules in the parents' favor at the administrative level, the local school authorities must cover the costs of the private placement from that point forward. *School Comm. of Burlington v. Department of Educ. of Mass.,* 471 U.S. 359, 372, 105 S.Ct. 1996, 85 L.Ed.2d 385 (1985); *see*

*Susquenita Sch. Dist. v. Raelee S.,* 96 F.3d 78, 86–87 (3d Cir.1996) (finding that after a disagreement over a child's IEP which results in a unilateral parental placement, a school district's financial responsibility begins when an administrative or judicial decision vindicates the parents' position). This does not mean, however, that the local school authority will ultimately be responsible for those costs if, for example, a district court overturns the hearing officer's decision. In any case involving a unilateral parental placement, it is the parents who bear the financial risk. *Burlington,* 471 U.S. at 373–74, 105 S.Ct. 1996. Thus, we do not find that the stay-put provision operates in the manner suggested by plaintiff.

trying to select a mutually-agreeable placement, and during the PPT meetings they suggested several possible programs. The three most frequently discussed were The Rectory School,[8] The Learning Clinic,[9] and the ACES program at the Norwich Free Academy[10] (for the 1997–98 school year only). As the Hearing Officer noted, the Board initially agreed with the parents' proposal to place M.C. at The Rectory School, but withdrew its offer once The Rectory School refused to enter into a contract with it. Based on the Board's assertion—at the time—that The Rectory School would have been an appropriate placement, we review the circumstances surrounding the Board's decision to change its position.

8. The Rectory School has a total of about 180 students, of which about 105 are boarding students and 65 are day students. Tr. of 6/27/97, at 27. All of the boarding students are boys, and they range from fifth through ninth grade. *Id.* at 32–33. The Rectory School employs 54 full-time teachers, including 35 full-time tutors. *Id.* at 99–100. The classes are generally 12 or fewer students. *Id.* at 33. Children are grouped according to their ability, and as they improve they are put into more challenging classes. *Id.* at 34, 38. About 70% of the students receive individual tutoring. *Id.* at 27. The tutoring program takes place during one of the academic periods of each class day. *Id.* at 36. Approximately 60% of the students in the tutoring program have disabilities, and some have ADHD. *Id.* at 34, 100.

9. The Learning Clinic is located in Brooklyn, Connecticut. It is designed for children between the ages of nine and nineteen who are bright-to-average in intelligence. Ex. B–13. It focuses on children with ADHD, learning disabilities, or who suffer from depression or anxiety. Tr. of 7/7/97, at 57–58. It also specializes in children with co-morbid conditions, such as depression, associated anxiety disorders, bi-polar disorders, mild Tourette's disorder, and obsessive compulsive disorder. *Id.* at 58. The average class size is six children usually with two teachers and support staff. There are approximately 60 to 70 students at the school, of which about 40 are residential students. *Id.* at 66.

10. The Norwich Free Academy is one of three endowed academies in Connecticut. It serves as the designated high school for eight area

The parties first agreed that M.C. required an outside placement at the February 8, 1996 PPT meeting. During this meeting Anita Powers, Voluntown's Special Education Coordinator, proposed The Learning Clinic, the EASTCONN program at Columbia, and the EASTCONN program at Salem Clinical Day Program. Ex. B–7, at 3. She suggested that the parents contact these schools to arrange a visit, "or if they know of any other program that might suit [M.C.]'s needs, they should make plans to visit them." *Id.* In Powers' opinion, M.C. needed a small program focusing on students with emotional problems relating to depression and ADD. She stated that M.C. "is a bright student and he needs a program that will challenge him." *Id.* at 4. In her view, the programs

towns, including Voluntown. It has about 2,000 students. Tr. of 8/26/97, at 88. The ACES program is one of the school's special education programs, and it is operated on the campus of the Norwich Free Academy. The program begins with ninth grade and has about 50 students. The ACES program is designed for students with special education needs, especially those with emotional disabilities or some level of emotional disturbance. *Id.* at 89. The students are primarily diagnosed as seriously emotionally disturbed, but there are also some students with learning disabilities. *Id.* at 91–92. According to the Student Services Administrator, the "focus of the ACES program is the development of social/emotional behavioral strategies." *Id.* at 96. Powers described the program as:

a flexible program that can be self-contained and allows for students to be partially or fully included in the mainstream if appropriate. The program staff is made up of five teachers and a school psychologist. The teachers work in teams of two teachers each. Each team shares a maximum of 25 to 30 students. The average class size is twelve. Each teacher has a special education intern working with him or her. The ACES program uses a behavior management point system. The fifth teacher teaches science and is the program manager. This teacher also handles discipline. The school psychologist provides individual and group counseling as recommended in students' IEP's ... The program supports high academic achievement.

Ex. B–52A, at 4–5; *see* Tr. of 8/26/97, at 89–97.

that had been suggested during the meeting were designed for bright students with emotional problems or ADD problems. *Id.* She expressed concern about placing M.C. in a program that would be too demanding.

Mrs. C. then commented that M.C.'s psychiatrist and psychologist were working together to make recommendations. *Id.* Additionally, Cathy Ziegler, the parents' advocate, stated that she was familiar with Powers' suggestions and believed that those programs are therapeutic and more behavior-oriented. Instead, she proposed Pine Point School, Saint Thomas More, and The Williams School. *Id.* A Voluntown Elementary School counselor, who was present at the meeting, noted that Pine Point is writing-oriented, and that both Pine Point and The Williams School are extremely competitive academically. *Id.* According to Ziegler, M.C. needed a program with a challenging, structured curriculum that uses computers.

After this meeting, Ziegler and M.C.'s parents began investigating various programs. Mrs. C. testified that she called approximately fifteen schools herself. Tr. of 5/27/97, at 37–38. She visited at least four. Tr. of 4/10/97, at 128. Ziegler testified that they "visited schools, called schools, [and] received video tapes, audio tapes, [and] literature from schools that might be a placement option for [M.C.]" Tr. of 7/3/97, at 92. Ziegler stated that she called the neighboring school boards of Lisbon, Plainfield, Montville, New London, Groton, Waterford, and Griswold. Ex. P–3. In addition to Pine Point School, Saint Thomas More, and The Williams School, Ziegler and the parents researched St. Andrew's School in Rhode Island. Tr. of 4/10/97, at 144; Tr. of 7/3/97, at 92. Upon a recommendation from Dr. Sharp, they also considered The Rectory School. Tr. of 7/7/97, at 35–36.

At the June 17, 1996 PPT meeting, the team again discussed M.C.'s need for an outside placement. Ex. B–13, at 3. Ziegler stated that she had visited numerous schools with Mrs. C. and M.C., and she "feels that the Rectory School would be most appropriate for meeting [M.C.]'s needs." *Id.* Powers expressed concern about M.C.'s ability to be successful at The Rectory School. Specifically, she questioned whether he would be able to keep up with the pace and accomplish enough work, and whether there would be enough emotional support for him. *Id.* Both Dr. Sharp and Dr. Gardner thought that The Rectory School was an appropriate placement for M.C. Tr. of 7/7/97, at 41; Tr. of 7/3/97, at 24; *see* Tr. of 7/3/97, at 20–21.

Powers then raised the issue of placing M.C. at The Learning Clinic. Ziegler disagreed, stating that The Learning Clinic primarily serves students who have serious emotional problems. Ex. B–13, at 3. Both Mrs. C. and Ziegler testified that Paul Mullen, a consultant from EASTCONN who attended the PPT meeting, also did not think it was an appropriate placement. Tr. of 5/27/97, at 45; Tr. of 7/3/97, at 93. Indeed, Ziegler testified that no one except Powers agreed to The Learning Clinic. Tr. of 7/3/97, at 93. Dr. Sharp also disagreed. Ex. B–13, at 3. She stated that The Learning Clinic has a high turnover of staff and noted that M.C. does not adjust well to change. *Id.* She further testified that it provides an extremely limited opportunity for students to interact with nondisabled children. Tr. of 7/7/97, at 36–37. Finally, she stated that she had not been impressed with the progress made by students who attend the program. *Id.* at 37–38; *see id.* at 45–46.

The minutes summarizing this meeting indicate that the team recommended outplacement, but did not agree on the school. Ex. B–13, at 1. At Powers' request, the parents signed a release of information form permitting Voluntown to send M.C.'s records to The Rectory School, but they refused to sign one for The Learning Clinic. Instead, the parents stated that they would initiate due process proceedings.

M.C. then attended and successfully completed the summer program at The Rectory School. Between August and September of 1996, Ziegler had several discussions with Powers about placing M.C. at The Rectory School for the upcoming school year. According to Ziegler, they agreed that it would be a good placement for M.C., but the Board wanted The Rectory School to sign a contract guaranteeing that it would provide M.C. with the services set forth in his IEP. Tr. of 7/3/97, at 97–98. At the time, they were hopeful that The Rectory School would sign such a contract. *Id.;* Tr. of 8/26/97, at 16.

On August 27, 1996, Powers wrote to Thomas Badway, who is employed by the State Department of Education in the Bureau of Special Education and Pupil Services, Due Process Unit. She stated that:

> The Voluntown Board of Education is in agreement with Mr. and Mrs. [C.] that Voluntown Elementary School is not an appropriate placement for [M.C.]. The Voluntown Board of Education also agrees that the Rectory School, although it is not an approved special education school, would be an acceptable placement for [M.C.] since the Rectory School can follow the IEP that was written for [M.C.] on June 17, 1996.

Ex. P–4, at 2. Powers drafted a pre-agreement statement on September 6, 1996. At the bottom of the draft which she sent to Ziegler, Powers wrote "This is contingent on the Rectory School signing an agreement to follow the IEP, be represented at PPT's, report on progress of goals + objectives and overall school progress, and allow me to visit the school. Otherwise, we will not have a pre-agreement." Ex. B–42.

On September 8, 1996, Powers met with several people from The Rectory School including: Carole Gooder, Director of Individualized Instruction; Thomas F. Army, Headmaster; Francesca Morano, Director of Studies; Steve DiPaolo, Director of Admissions; and Lisa Levesque, Director of the Instructional Technology Department.

Tr. of 6/27/97, at 102–03. According to Gooder, they talked about M.C.'s needs, reviewed the June 17th IEP, and discussed how The Rectory School could meet the goals and objectives listed in the IEP. *Id.* Representatives of The Rectory School had previously received a copy of the June 17th IEP, which they marked up and sent back to Ziegler. Tr. of 7/7/97, at 166–67; *see* Ex. P–1. The purpose had been to see which goals and objectives The Rectory School would be able to support. Tr. of 7/3/97, at 99. At the meeting, Gooder and Levesque raised areas in which they thought The Rectory School might have difficulty meeting the goals and objectives. For example, one of the goals was for M.C. to participate in a social skills group. *See* Ex. B–14, at 4. Gooder felt that The Rectory School could not meet that goal because it does not have that type of program. Instead social skills are taught on an informal basis. Tr. of 6/27/97, at 104–05. According to Gooder, however, Powers "seemed to feel that the areas we discussed as possible problems for us would not be a problem for her." *Id.* at 103–04. There was no direct contact between the Board and The Rectory School after this meeting. *Id.* at 143–44.

On the next day, September 9th, M.C. started classes at The Rectory School for the fall semester. Tr. of 5/27/97, at 53. That same day, Powers wrote to Ziegler and stated that "Voluntown does not disagree with The Rectory School as an out placement for [M.C.], however, it is necessary for a hearing officer of the State of Connecticut to give the school system permission to send [M.C.]. there." Ex. P–6. She outlined the conditions that Voluntown wanted The Rectory School to meet before placing M.C. there, including requirements that it would agree in writing to follow M.C.'s IEP, would report periodically to Powers and to the parents about M.C.'s progress on the goals and objectives set forth in the IEP; would send a representative to attend PPT meetings; and would permit Powers to visit the school. *Id.*

Also on September 9th, Army wrote to Mrs. C. and informed her that The Rectory School would not enter into a contractual agreement with the Board. Ex. B–19. He stated, "Historically, we have always contracted directly with the parents and we feel strongly that our accountability for the education of any child rests with the child's parents and not a third party." *Id.; see* Ex. HO–1 (letter from Army to Ziegler dated September 23, 1996 setting forth The Rectory School's concerns).

In a letter dated September 12, 1996, Powers wrote to Ziegler explaining Voluntown's reasons for determining that placing M.C. at The Rectory School for the 1996–1997 school year would be inappropriate. This letter summarizes Voluntown's position on this matter, and thus we quote it in its entirety:

This communication is intended to reflect the Voluntown Board of Education's position regarding the placement of [M.C.] for the 1996–97 school year. While the parties are in agreement that an outside placement is appropriate for [M.C.], recent developments indicate that the Rectory School in Pomfret, Connecticut will not represent an appropriate placement for the following reasons:

(1) the Rectory School is not an approved special education facility;

(2) the Rectory School refuses to enter into a contract with the Voluntown Board of Education regarding [M.C.]'s placement; and;

(3) the Rectory School has indicated it cannot fulfill all the provisions of [M.C.]'s individual education program (IEP), especially in the area of counseling.

With regard to the aforementioned problems, the first problem could be rectified by mutual agreement between the parties subsequently authorized by a special education hearing officer. The Board would not be able to participate in a mutual agreement, however, unless the Rectory School is willing to enter

into a contract with the Board. Absent such contract, the Board has no ability to monitor and control the provision of IEP services as it is required to do by law. If the Rectory School would change its positions regarding a contractual arrangement with the Board, it is anticipated that the counseling issue could be resolved in some other manner.

While the board would greatly wish to enter an agreement regarding the placement of [M.C.], the problems above must be rectified. If the Rectory School is unwilling to enter a contractual arrangement with the Board, the Board would propose placing [M.C.] in an approved facility which is capable of meeting his needs, such as The Learning Clinic, where these routine issues do not result in conflicts.

Ex. B–20. The Board and M.C.'s parents never agreed on a placement for the 1996–97 school year. M.C. remained at The Rectory School, and, by all accounts, made remarkable progress. As the Hearing Officer stated, "The Rectory School did an excellent job of educating [M.C.] as all the professionals testified and the records show." Ex. SB–31 ¶ 13, at 11.

At the end of eighth grade, the Board planned a PPT meeting, which was held on May 27, 1997, to prepare M.C.'s IEP for ninth-grade. At this meeting, the Board for the first time proposed placing M.C. at the ACES program at Norwich Free Academy. The ACES program had not been a placement option for the previous year because the program begins with ninth grade. Thus, it only became available to M.C. starting with the 1997–98 school year. In addition to the ACES program, the Board again proposed The Learning Clinic. According to Ziegler, the Board did not inform the parents before the May 27th meeting that it was considering the ACES program or The Learning Clinic as proposed placements for the 1997–98 school year. Tr. of 7/3/97, at 107.

The PPT rejected all of the parents' requests, including a request to maintain M.C.'s placement at The Rectory School. The PPT did, however, review M.C.'s winter grade report from The Rectory School and consider Mrs. C.'s verbal report on M.C.'s progress. Ex. B–52A, at 4. Nevertheless, the PPT rejected the parents' request to place M.C. at The Rectory School because "there is no contract." *Id.* at 1. The minutes state that:

> The Voluntown Board of Education cannot recommend The Rectory School because it is not an appropriate placement. There is no agreement that The Rectory School will follow an IEP or obey State and Federal regulations. Special education does not mean anything under these circumstances. It is simply being used to pay for a private school. The Voluntown Board of Education cannot legally place [M.C.] at the Rectory School.

*Id.* at 5. Instead, the PPT recommended that M.C. attend The Learning Clinic or the ACES program because both schools could follow M.C.'s IEP. *Id.*

Based on these facts, the Hearing Officer made the following conclusions of law:

2. The problem arises with where the IEP is to be implemented with the refusal of the Rectory School to sign a contract with the Board concerning the delivery of services within the procedures mandated under the IDEA.

3. The Rectory School is not required to follow the rules of the IDEA and so was within its rights by refusing such a contract. Not admirable perhaps but certainly within its rights.

7. Herein lies the nub of the issue. If the Rectory School was an appropriate placement what significance and importance must be placed on its refusal to sign a "contract" and what fallout does that have.

8. The significance is that the Rectory School is not under *any* obligation to meet its supposed commitment to [M.C.]'s IEP and its goals and objectives. The Rectory school essentially offered a "handshake" agreement, in short its history and reputation as a school that did well by its students as a substitute for a "contract" . . . .

14. The Board's original decision to agree to the Rectory School placement as appropriate still stands as a valid educational decision. The fact that because of a difference over procedure, i.e., the contract, however egregious and forbidding the Board may have considered this to be, does not negate the rightness of the placement for purely educational reasons. In essence the Board agreed that a free appropriate public education . . . could be provided at the Rectory School.

Ex. SB–31, at 10–11 (emphasis in original). The Hearing Officer then found that the Board offered The Rectory School as a placement for 1996–97, concluded that this was an appropriate placement, and ordered the Board to pay for the costs of the day program and the tutoring program. *Id.* ¶¶ 1 & 3, at 12. Yet for the 1997–98 year, the Hearing Officer found that the Board offered an appropriate placement for M.C. at the ACES program. *Id.* ¶ 4, at 12; *see id.* ¶ 15, at 12. She thus concluded that The Rectory School was not an appropriate placement for that year. *Id.* ¶ 2, at 12.

We find that the Hearing Officer erred as a matter of law in several respects. First, we disagree with her conclusion that the Board offered a placement at The Rectory School for the 1996–97 school year. The facts set forth above indicate that the parents proposed The Rectory School as a placement, and that the Board rejected this placement once The Rectory School decided it would not contractually agree to comply with the IDEA's requirements. Indeed, there is no IEP indicating that the Board agreed to place M.C. at The Recto-

ry School for the 1996–97 school year. Additionally, the Board stated that in the absence of a contract with The Rectory School, it would propose placing M.C. at The Learning Clinic instead. Ex. B–20. Without an agreement. between the Board and the parents, we find that M.C.'s placement at The Rectory School was properly considered a unilateral parental placement. In light of the Hearing Officer's finding that The Rectory School was an appropriate placement for the 1996–97 school year—a finding from which the Board does not appeal—we conclude that the Board did not offer M.C. an appropriate program for eighth grade. It is inconsistent for the Hearing Officer to have ordered the Board to reimburse the parents for the tuition and tutoring costs for the 1996–97 school year, without also finding that the Board's proposal was inappropriate.

Second, we find that the Hearing Officer erred as a matter of law regarding M.C.'s placement for the 1997–98 school year. This is not a situation where both the Board and the parents proposed appropriate placements *from the outset;* and then one of the parties invoked due process procedures in order for a hearing officer to choose between the two. The Board would have us focus on the IEP for the 1997–98 school year only. It argues that it did propose an appropriate placement for that year when it suggested the ACES program. Thus, defendant urges us to apply the two-part *Burlington* test, and to

begin our discussion with a review of the appropriateness of the ACES program.

We find, however, that we must begin with the 1996–97 school year because it was as a result of M.C.'s eighth grade-IEP that M.C.'s parents made the unilateral placement. As we just found, the Board did not offer M.C. a free appropriate public education. for the 1996–97 school year. Thus, we find that this case resembles the facts of the Supreme Court's decision in Carter, because we are presented with a situation where the local school board did not offer an appropriate placement at the outset, thereby causing the parents to unilaterally place their child in a program that was otherwise proper, but did not meet the requirements of 20 U.S.C. § 1401(a)(18). Consequently, we find that the Hearing Officer erred as a matter of law in finding that the *Carter* decision was not an accurate analogy in this case. *See* Ex. SB–31 ¶ 12, at 11.

In *Carter* the Supreme Court held that the requirements of 20 U.S.C. § 1401(a)(18) do not apply to parental placements.[11] Thus, it does not matter whether the parents placed their child at a private school that was specifically approved by the local school authorities. 510 U.S. at 14, 114 S.Ct. 361. Additionally, the fact that a private school does not meet state education standards is not a bar to reimbursement. *Id.; Muller v. Committee on Special Educ. of East Islip Union Free Sch. Dist.,* 145 F.3d 95, 105 (2d Cir.1998).

---

**11.** The Supreme Court reasoned that:

Section 1401(a)(18)(A) requires that the education be "provided at public expense, under public supervision and direction." Similarly, § 1401(a)(18)(D) requires schools to provide an IEP, which must be designed by "a representative of the local educational agency," 20 U.S.C. § 1401(a)(20) (1988 ed., Supp. IV), and must be "establish[ed]," "revise[d]," and "review[ed]" by the agency, § 1414(a)(5). These requirements do not make sense in the context of a parental placement. In this case, as in all *Burlington* reimbursement cases, the parents' rejection of the school district's proposed IEP is the very reason for the parents' decision to put their child in a private school. In

such cases, where the private placement has necessarily been made over the school district's objection, the private school education will not be under "public supervision and direction." Accordingly, to read the § 1401(a)(18) requirements as applying to parental placements would effectively eliminate the right of unilateral withdrawal recognized in *Burlington.* Moreover, IDEA was intended to ensure that children with disabilities receive an education that is both appropriate and free. To read the provisions of § 1401(a)(18) to bar reimbursement in the circumstances of this case would defeat this statutory purpose.

510 U.S. at 13–14 (citation omitted).

Finally, and most relevant for our purposes, it is not necessary for the parents' placement to provide special education in conformity with the IEP requirements of section 1414(a)(5). *See* 20 U.S.C. § 401(a)(18)(D). Thus, there was no legal basis for the Board to insist that The Rectory School contractually agree to comply with the IDEA's requirements relating to IEPs.[12] As the lack of a contract was the only reason the Board objected to placing M.C. at The Rectory School, we find that the Hearing Officer erred when she concluded that The Rectory School was an inappropriate placement for the 1997–98 school year, particularly when she had found it an appropriate placement for the previous year. Consequently, on this issue we grant plaintiff's summary judgment motion and deny defendant's cross-motion.

## III. Costs for Psychological Counseling

■ A disabled child is entitled to psychological counseling at no cost to his parents if it is required to help him benefit from special education. *See* 20 U.S.C. § 1401(a)(17); *Irving Indep. Sch. Dist. v. Tatro,* 468 U.S. 883, 894, 104 S.Ct. 3371, 82 L.Ed.2d 664 (1984) (stating that "only those services necessary to aid a handicapped child to benefit from special education must be provided"); *Papacoda v. Connecticut,* 528 F.Supp. 68, 72 (D.Conn. 1981) (finding that a state agency is required to fund the costs of psychological services which are required to assist a disabled child to benefit from special education). In this case, the Hearing Officer did not make a finding as to whether or not psychological services were necessary for M.C. to make educational progress.

Instead, the Hearing Officer found that the "services of Dr. Gardner, [M.C.]'s therapist, were not called for in [M.C.]'s IEP where only school counseling was indicated. In addition, Dr. Gardner did not see [M.C.] during the 1996–97 school year." Ex. SB–31 ¶ 16, at 12. She then concluded that the Board was not responsible for paying the cost of Dr. Gardner's counseling services. In the absence of a proper conclusion of law, we have reviewed the record for evidence as to whether M.C. required psychological services to help him benefit from special education. Based on our findings, we overturn the Hearing Officer's decision.

■ The issue before us is whether the parents are entitled to reimbursement for Dr. Gardner's services which were provided from Spring 1995 to Summer 1996. M.C. started therapy with Dr. Gardner in April or May of 1995, when he was in sixth grade, in order to address his depression and the difficulty he was having in school. Tr. of 4/10/97, at 66; Tr. of 5/27/97, at 66. Before that time, M.C. had been seeing a psychiatrist, Dr. McKnight, who had been treating M.C. for his ADHD. Tr. of 4/10/97, at 67–71. Because she felt that the medication she had prescribed was not helping M.C.'s depression, Tr. of 7/3/97, at 9, Dr. McKnight recommended that M.C. see Dr. Gardner, who specializes in childhood depression. Tr. of 4/10/97, at 85; Tr. of 7/3/97, at 6. For about one year, M.C. received counseling from Dr. Gardner once a week. Beginning in about April 1996 he went once every other week, Tr. of 4/10/97, at 85–86; Tr. of 7/3/97, at 19, until he began the residential program at The Rectory School in September 1996. Tr. of

---

12. There is also no provision in the Connecticut statutes requiring the Board to obtain a contractual commitment from a private school before out-placing a disabled child there. In a brief submitted to the Hearing Officer, the Board asserts that C.G.S.A. section 10–76d(d) requires the Board to "either locally provide for mandated educational opportunities or contract by agreement to provide for such opportunities." Ex. HO–4, at 5. The Board's position is belied by the statute itself which uses permissive, and not mandatory, language. Specifically, section 10–76d(d) provides that, "[t]o meet its obligations under sections 10–76a to 10–76g, inclusive, any local or regional board of education *may* make agreements with another such board ... or make agreements with any private school ... to provide the necessary programs or services...." C.G.S.A. § 10–76d(d) (emphasis added).

5/27/97, at 67. Since that time, M.C. has not had any continuous therapy sessions with Dr. Gardner, except that he had two sessions during the winter and spring breaks of the 1996–97 school year. Tr. of 5/27/97, at 68–69. Moreover, while M.C. attended The Rectory School, he did not receive any individual or group counseling. *Id.* at 90.

When Dr. Gardner began treating him, M.C. had already been diagnosed with dysthymia, which is the modern version of reactive depression. Tr. of 7/3/97, at 11. Dr. Gardner described this as "a self-limited and a relatively minor form of depression that is related to experiences or a bad situation that the child is in." *Id.* He further testified that while dysthymia is less serious than, for example, a psychotic depression, "this was one of the most serious cases of reactive depression I'd ever seen in a child." *Id.* at 12. According to Dr. Gardner, M.C.'s symptoms included sadness, irritability, bad behavior, temper tantrums, lack of energy, and difficulty waking up in the morning. *Id.* at 10. He also stated that M.C. exhibited some secondary symptoms including a tendency to socially isolate, crying a lot, becoming easily upset, and lacking self-confidence. *Id.*

During the administrative hearing, Dr. Gardner testified that in his opinion, the cause of the reactive depression was M.C.'s continued "un-success" in school as the difficulties relating to his teachers was "very prominent." *Id.* at 12. He explained that a vicious cycle had been established—where M.C.'s symptoms were causing more difficulties in his ability to relate to his teachers. *Id.* at 13. When asked whether M.C. was responding to conditions at school, or whether M.C.'s symptoms and behavior were causing problems at school, Dr. Gardner responded:

> It would be difficult for me to say it was more one than the other. I think that there was both a rejecting attitude on the part of his teachers, but also he was irritable and couldn't get along with his

teachers either. I assume that the attitude of the teachers and what his experiences [sic?] preceded his reaction to the teachers.

*Id.* at 13–14.

Dr. Gardner also expressed his opinion on the cause of M.C.'s depression in two letters. When Mrs. C. decided to remove M.C. from school in mid-January 1996, Dr. Gardner wrote a letter to the principal of Voluntown Elementary School. He stated, "While [M.C.]'s everyday experiences in school have not caused the depression directly, the constant frustration, failure, and anxiety make his condition worse. He has become despondent and distressed and possibly suicidal." Ex. B–6. The second letter is dated September 11, 1996 and is addressed "To Whom It May Concern." Dr. Gardner stated:

> Clearly, it was his repeated failure in school and the negative attitude of his teachers that maintained the depression, not the parents' divorce, which, extraordinarily, seems to have had relatively little influence on the onset of symptoms or on their reduction.
>
> I am convinced that [M.C.]'s depression was a result of his academic and conduct problems at school, which is not uncommon in a child with ADHD and diagnosed learning disorders. He has already demonstrated that when teachers have a positive, accepting attitude, his self-confidence, self-esteem, and cooperation soar.

Ex. P–2, at 1–2. Based on Dr. Gardner's opinion, as expressed in his testimony and his letters, we find that there is a substantial connection between M.C.'s depression and his progress, or lack thereof, in school. Indeed, Anita Powers, Voluntown's Special Education Coordinator, testified that Dr. Gardner was the best source as to the nature of M.C.'s disabilities and the cause of the emotional disabilities. Tr. of 8/26/97, at 36.

Furthermore, there is evidence from several people who testified at the admin-

istrative hearing that M.C.'s depression was linked to his failures at school. In Mrs. C.'s opinion, M.C. required counseling from Dr. Gardner for his depression because of the experiences he was having at school. Tr. of 5/27/97, at 113. She further stated that she believed "he was depressed directly related to what was happening to him at school." *Id.* at 116. Additionally, Powers testified about her understanding of Gardner's opinion on the need to remove M.C. from the Voluntown schools in February 1996. She stated, "His feeling was that [M.C.] had difficulty with school and teachers' requirements of him, and that all of this was building up and causing him to be depressed." Tr. of 8/26/97, at 11.

Finally, there is evidence that M.C.'s PPT intended to incorporate counseling into his IEP. At the September 14, 1995 PPT meeting Dr. Susan Sharp, the independent special education consultant, reviewed her report of her evaluation of M.C. dated May 1995. Ex. B–5, at 2. She stated that M.C.:

> *may* benefit from individual and group counseling to help address his underlying feeling of frustration and anger. [M.C.]'s problem solving abilities for socially and emotionally-charged situations are very poor. Additionally, his rigid cognitive style, difficulty sorting through relevant and irrelevant information and his struggle to determine priorities, interfere with his problem solving abilities.

*Id.* (emphasis added). The PPT also discussed the goal of having M.C. become a self-advocate. They recommended that M.C. meet with Kathy Driscoll, a Voluntown special education teacher and M.C.'s case manager, thirty minutes each week to review his progress in school. They would also review self-advocacy issues. The PPT believed that if the teachers could help M.C. learn to speak up for himself, it would be "very positive" for him. *Id.* at 4. Finally, the team agreed that M.C. will have "counseling on an as needed basis."

It is unclear from the PPT minutes if the counseling is separate from the meetings with Driscoll.

In the minutes of the February 8, 1996 PPT meeting, there is no mention of counseling, Ex. B–7, nor does the IEP for homebound tutoring include any counseling. Ex. B–9. However, at the June 17th PPT meeting, the team recommended that M.C.'s school counselor give feedback to his outside therapist, as needed. Ex. B–13, at 2. Additionally, M.C.'s IEP for the 1996–97 school year, which was drafted by Dr. Sharp, provided for forty-five minutes of individual counseling per week with a school psychologist and thirty minutes of social skills group twice a week. Ex. B–14, at 4. The IEP also contained several social and emotional goals for M.C., including improving his ability to interact with peers and adults and improving his social and emotional adjustment within the school environment. *Id.* at 14–18. The IEP further provided that the person to implement these goals would be a school counselor or school psychologist.

From all this evidence we conclude that M.C. required counseling in order for him to receive educational benefits. The fact that he did not make any academic progress during seventh grade, while he was being treated by Dr. Gardner, is not dispositive on this issue. To the contrary, his academic deterioration during that period shows that the substantial connection between his disabilities and his problems at school was preventing him from making any meaningful educational progress. Moreover, M.C.'s IEPs for seventh and eighth grade include counseling as part of his education. Although the IEPs recommended that either a school counselor or a school psychologist provide these services, for our purposes, these recommendations show that the PPT determined that M.C. needed counseling in order to receive educational benefits. Accordingly, we grant summary judgment to plaintiff and deny defendant's motion for summary judgment on this issue.

## IV. Attorney's Fees and Costs

The IDEA provides that a court may, in its discretion, award reasonable attorneys' fees and costs to the prevailing party. 20 U.S.C. § 1415(e)(4)(B). Here, plaintiff is requesting $46,495.00 in attorneys' fees and $210.40 in costs, for a total of $46,705.40. At first, plaintiff was seeking a total of $39,677.90, but later supplemented his request to include $7,027.50 for attorneys' fees related to his fee application and his opposition and reply briefs.[13]

■ The threshold issue is whether plaintiff may be considered a prevailing party. *Hensley v. Eckerhart*, 461 U.S. 424, 433, 103 S.Ct. 1933, 76 L.Ed.2d 40 (1983). Defendant argues that plaintiff is not a prevailing party because he did not prevail on a significant issue in this litigation. Defendant claims that the Board agreed from the beginning to reimburse M.C.'s parents for the tuition costs of The Rectory School. According to defendant, the "only issue at stake when M.C. requested the due process hearing in August 1996 was whether the Board should also be required to reimburse M.C. for his residential placement at The Rectory School." Def.'s Mem. of 10/13/98, at 24. Defendant contends that because the Hearing Officer ruled in M.C.'s favor only with respect to the tuition and tutoring costs of The Rectory School for the 1996–97 school year, and because defendant had already agreed to pay these costs, plaintiff did not prevail on any significant issue and, therefore, cannot be considered a prevailing party.

Despite defendant's assertions, we find that at the administrative hearing the Board contested its responsibility for funding the tuition and tutoring costs of The Rectory School for the 1996–97 school year. Indeed, the Hearing Officer cited the issue of whether The Rectory School was appropriate for the 1996–97 school

year as one of the issues before her. She noted that the Board initially agreed to place M.C. in The Rectory School's day program, but only under certain conditions which were unacceptable to The Rectory School. Ex. SB–31, at 3. The correspondence between the Board and Ziegler during August and September highlights the disagreement between the Board and The Rectory School. *See, e.g.*, Ex. P–6; Ex. B–20.

Moreover, when the hearing began on April 10, 1997, counsel for defendant made an opening statement in which he described The Rectory School as being "a patently illegal placement." Tr. of 4/10/97, at 43. He then stated that the Board "could not make a placement at The Rectory School, because by definition it could not provide a free and appropriate public education there because that school categorically refuses to abide by the law. The Board cannot be faulted for refusing that placement and trying to pursue some other placement." *Id.* at 43–44.

From all this evidence, it is clear that the Board disputed its responsibility for covering the tuition and tutoring costs of The Rectory School for the 1996–97 school year. Consequently, we find that plaintiff is a prevailing party because he obtained relief on a significant claim in the litigation when the Hearing Officer directed the Board to reimburse his parents for these costs. *See Texas State Teachers Ass'n v. Garland Indep. Sch. Dist.*, 489 U.S. 782, 109 S.Ct. 1486, 103 L.Ed.2d 866 (1989) (setting forth the prevailing party standard).

We therefore consider the reasonableness of the rates and hours requested by plaintiff. *Hensley*, 461 U.S. at 433, 103 S.Ct. 1933 (stating that the starting point for assessing the reasonableness of a fee request is to multiply the number of hours

---

**13.** Generally, prevailing parties are entitled to reimbursement for time expended by their lawyers in preparing fee applications. *Gagne v. Maher*, 594 F.2d 336, 343–44 (2d Cir.1979), *aff'd*, 448 U.S. 122, 100 S.Ct. 2570, 65

L.Ed.2d 653 (1980). Because defendant did not object to this portion of plaintiff's fee request, we find it appropriate to include these fees.

reasonably expended on the litigation by a reasonable hourly rate). Plaintiff asserts that the prevailing rate for Attorney David Shaw should be $250 per hour based on his expertise in the area of special education and his twenty-five years' experience practicing law.

Additionally, plaintiff requests that this Court apply a rate of $175 per hour for Attorney Andrew Feinstein and $150 per hour for Attorneys Joy Fausey and Richard Roznoy. Based on the number of hours expended by each of these attorneys, plaintiff requests fees as follows:

| Attorney | Hours | Rate | Total |
|---|---|---|---|
| Shaw | 80.8 | $250 | $20,200.00 |
| Fausey | 62.4 | $150 | $ 9,360.00 |
| Roznoy | 21.2 | $150 | $ 3,180.00 |
| Feinstein | 78.6 | $175 | $13,755.00 |
| | | TOTAL: | $46,495.00 |

As defendant did not object to either the reasonableness of the rates or hours, we accept $46,495.00 as our starting point.

■ Our inquiry does not end here, however. We must determine if this amount should be adjusted upward or downward after considering whether the relief sought by plaintiff is proportionate to the result obtained. *Hensley*, 461 U.S. at 434, 103 S.Ct. 1933; *Koster v. Perales*, 903 F.2d 131, 134 (2d Cir.1990); *Mr. and Mrs. H. v. Region 14 Bd. of Educ.*, No. 3:98–cv–93, 1999 WL 225070, at *3 (D.Conn. Mar.5, 1999) (Eginton, J.). According to the Supreme Court in *Hensley*, the degree of the plaintiff's success is the most critical factor in determining the size of the fee award. 461 U.S. at 436, 103 S.Ct. 1933. Thus, where "a plaintiff has achieved only partial or limited success, the product of hours reasonably expended on the litigation as a whole times a reasonable hourly rate may be an excessive amount." *Id.*

■ Defendant contends that plaintiff should receive no fee at all because the success he obtained is not proportional to the amount of requested fees. Specifically, defendant asserts that the only possible issue on which plaintiff prevailed related to the tuition and tutoring costs of The Rectory School for the 1996–97 school year. In contrast, the Hearing Officer ruled against plaintiff on the issues of reimbursement for the costs of the residential program for the 1996–97 school year, all costs of The Rectory School for the 1997–98 school year, the costs of Dr. Gardner's psychological counseling, and the costs of Ziegler's services as the parents' advocate. Accordingly, defendant urges this Court to limit a fee award, if any, to "attorney's fees actually incurred in obtaining an award on the 1996–97 tuition issue." Def.'s Mem. of 10/13/98, at 25.

Plaintiff argues that even if the only issue had been the tuition and tutoring costs of The Rectory School for the 1996–97 school year, "it is doubtful that plaintiff would have expended substantially less effort." Pl.'s Mem. of 9/11/98, at 46. Indeed, plaintiff contends that he is entitled to a full award of attorneys' fees because "[t]here is little way to parse the work performed to date." *Id.* Additionally, plaintiff relies on the Supreme Court's decision in *Hensley* for the proposition that "[w]here a plaintiff has obtained excellent results, his attorney should recover a fully compensatory fee." 461 U.S. at 435, 103 S.Ct. 1933. According to plaintiff, he obtained excellent results because the Hearing Officer ruled that The Rectory School was an appropriate placement.

We disagree with plaintiff as to the level of his success. Even though the Hearing Officer found The Rectory School to be an appropriate placement, her conclusion applied only to the 1996–97 school year, and not to the 1997–98 school year. She also limited plaintiff's relief to reimbursement for the costs of the day program, because she determined that M.C. did not require a residential placement. Moreover, the Hearing Officer's decision did not affect in any way the substance of M.C.'s education program for the school years at issue in this case. For example, M.C. did not receive any new or improved services as a result of the Hearing Officer's decision.

*Cf. D.H. v. Ashford Bd. of Educ.,* 1 F.Supp.2d 154, 162 (D.Conn.1998) (awarding the full amount of the requested fee because the plaintiff obtained a "high degree of success" when the hearing officer ordered the school board to make specific modifications, changes, and supplements to the child's IEP); *Y.O. v. New Britain Bd. of Educ.,* 1 F.Supp.2d 133, 139 (D.Conn. 1998) (refusing to reduce a plaintiff's fee request and rejecting the argument that the plaintiff's success was limited where, after initiating due process proceedings, the plaintiff received an independent evaluation, an order for the relief requested, and special services not offered previously); *C.G. v. New Haven Bd. of Educ.,* 988 F.Supp. 60, 67–69 (D.Conn.1997) (granting the full amount of attorneys' fees and finding that the plaintiff's success was "sweeping" because the plaintiff obtained an order for all of the relief for which the administrative hearing was requested). Here, the Hearing Officer only ordered relief in the form of reimbursement; she did not order the Board to revise M.C.'s IEP.

Comparing the relief sought by plaintiff to the relief he obtained, we find it would be inappropriate to award the full amount of plaintiff's requested fee. Nevertheless, we recognize that the issue of whether The Rectory School was an appropriate placement, in general, was the overriding issue during the administrative proceedings. To a large extent, the issues surrounding the appropriateness of The Rectory School for the 1996–97 school year overlapped with the issues relating to the 1997–98 school year. In contrast, the parties spent relatively little time on the issues of reimbursement for the residential placement and the costs of the parents' advocate.

Under the circumstances of this case, we find that a 25% reduction reflects the degree of plaintiff's success. *See Jason D.W. v. Houston Indep. Sch. Dist.,* 158 F.3d 205, 209–11 (5th Cir.1998) (upholding an approximate 75% reduction in attorneys' fees where the plaintiff prevailed on only three of nineteen issues presented to the hearing officer, and the plaintiff did not prevail on the issue of obtaining a new placement, which took up at least half of the administrative hearing); *David P. v. Lower Merion Sch. Dist.,* Civ. No. 98–1856, 1998 WL 720819 (E.D.Pa. Sept.18, 1998) (reducing attorneys' fees by 50% to reflect the plaintiff's partial success in a case where the plaintiff prevailed on the issue of reimbursement of tuition and costs for one semester of private school during ninth grade, but lost on issues relating to the costs of compensatory education for seventh and eighth grades); *Mrs. D. v. Apuzzi,* No. 3:96–cv–469, 1997 WL 597107 (D.Conn. Aug.1, 1997) (finding that the plaintiff achieved only partial success because she did not obtain all the relief she sought, and thus, reducing attorneys' fees by 60%); *G.R. v. Regional Sch. Dist. # 15,* No. 3:95–cv–2173, 1996 WL 762324 (D.Conn. Dec.26, 1996) (reducing attorneys' fees by 25% due to the plaintiff's partial success in a case where the parents did not ultimately prevail in keeping their son in a regular classroom, which was the primary issue in the case); *Field v. Haddonfield Bd. of Educ.,* 769 F.Supp. 1313, 1322–23 (D.N.J.1991) (finding a 50% reduction in attorneys' fees to be appropriate because the plaintiff lost on the paramount issues of obtaining a residential placement and changing his disability classification). Accordingly, we find that M.C. is entitled to $34,871.25 in attorneys' fees plus $210.40 in costs, for a total of $35,081.65.

## CONCLUSION

In sum, on the issue of reimbursement for the costs of the residential placement at The Rectory School for the 1996–97 and 1997–98 school years, we DENY plaintiff's summary judgment motion (Doc. # 23) and GRANT defendant's summary judgment motion (Doc. # 28). On the issue of reimbursement for the tuition and tutoring costs of The Rectory School for the 1997–98 school year, summary judgment is GRANTED to plaintiff and DENIED to

defendant. On the issue of reimbursement for the costs of Dr. Gardner's services, summary judgment is GRANTED to plaintiff and DENIED to defendant. Finally, we GRANT IN PART plaintiff's motion for attorneys' fees and costs (Doc. # 23 and Doc. # 34). Plaintiff is awarded $35,081.65 in attorneys' fees and costs. The Clerk of the Court is directed to enter judgment accordingly and to close this case.

SO ORDERED.